IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

TERESA A. PANOSH,

    Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.

No. C11-0043

RULING ON JUDICIAL REVIEW

---

## TABLE OF CONTENTS

**I.**    *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**II.**   *PROCEDURAL BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**III.**  *PRINCIPLES OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**IV.**  *FACTS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    *A.*    *Panosh's Education and Employment Background* . . . . . . . . . . . . 5
    *B.*    *Administrative Hearing Testimony* . . . . . . . . . . . . . . . . . . . . 5
        *1.*    *Panosh's Testimony* . . . . . . . . . . . . . . . . . . . . . . . . 5
        *2.*    *Vocational Expert's Testimony* . . . . . . . . . . . . . . . . . . 7
    *C.*    *Panosh's Medical History* . . . . . . . . . . . . . . . . . . . . . . . . 8

**V.**   *CONCLUSIONS OF LAW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    *A.*    *ALJ's Disability Determination* . . . . . . . . . . . . . . . . . . . . . 13
    *B.*    *Objections Raised By Claimant* . . . . . . . . . . . . . . . . . . . . . 15
        *1.*    *Dr. Penningroth's Opinions* . . . . . . . . . . . . . . . . . . . 15
        *2.*    *Consultative Examination and RFC Determination* . . . . . . . 19

**VI.**  *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**VII.** *ORDER* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

# I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Teresa A. Panosh on April 14, 2011, requesting judicial review of the Social Security Commissioner's decision to deny her applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits. Panosh asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits and SSI benefits. In the alternative, Panosh requests the Court to remand this matter for further proceedings.

# II. PROCEDURAL BACKGROUND

On March 19, 2007, Panosh applied for both disability insurance benefits and SSI benefits. In her applications, Panosh alleged an inability to work since June 30, 2004 due to panic attacks, anxiety, sleep disorder, and problems with her feet, neck, back, and knees. Panosh's applications were denied on June 13, 2007. On October 9, 2007, her applications were denied on reconsideration. On November 21, 2007, Panosh requested an administrative hearing before an Administrative Law Judge ("ALJ"). On April 28, 2009, Panosh appeared via video conference with her attorney before ALJ Marilyn P. Hamilton for an administrative hearing. Panosh and vocational expert Vanessa May testified at the hearing. In a decision dated July 28, 2009, the ALJ denied Panosh's claims. The ALJ determined that Panosh was not disabled and not entitled to disability insurance benefits or SSI benefits because she was functionally capable of performing work that exists in significant numbers in the national economy. Panosh appealed the ALJ's decision. On February 24, 2011, the Appeals Council denied Panosh's request for review. Consequently, the ALJ's July 28, 2009 decision was adopted as the Commissioner's final decision.

On April 14, 2011, Panosh filed this action for judicial review. The Commissioner filed an Answer on August 15, 2011. On September 15, 2011, Panosh filed a brief arguing that there is not substantial evidence in the record to support the ALJ's finding that she is not disabled and that she is functionally capable of performing work that exists in

significant numbers in the national economy. On November 10, 2011, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On June 29, 2011, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

## III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). Title 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." Id.

The Court will "affirm the ALJ's decision if it is supported by substantial evidence on the record as a whole." Gates v. Astrue, 627 F.3d 1080, 1082 (8th Cir. 2010) (citation omitted). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. Id. (citing Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005)); see also Wildman v. Astrue, 596 F.3d 959, 963-64 (8th Cir. 2010) ("'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.' McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000).").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." Vester v. Barnhart, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. Moore v. Astrue, 623 F.3d 599, 602 (8th Cir. 2010);

*see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Casey v. Astrue*, 503 F.3d 687 (8th Cir. 2007), the Eighth Circuit further explained that a court "will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 691 (citations omitted). "A decision is not outside that 'zone of choice' simply because [a court] may have reached a different conclusion had [the court] been the fact finder in the first instance." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman*, 596 F.3d at 964 ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Panosh's Education and Employment Background

Panosh was born in 1962. She did not graduate from high school. She attempted to earn her G.E.D., but did not complete it. She attended classes at Kirkwood Community College when she was 18, and as an adult. She has not earned a certificate or diploma from community college. At the administrative hearing, Panosh testified that she did not take any special education classes while in grade school or high school. She further testified that she could read and write the English language, and solve mathematical problems.

The record contains a detailed earnings report for Panosh. The report covers the time period of 1993 to 2008. Between 1993 and 2007, Panosh earned between $133.50 (2007) and $12,783.75 (1999). She has no earnings since 2008.

### B. Administrative Hearing Testimony

#### 1. Panosh's Testimony

At the administrative hearing, the ALJ inquired of Panosh whether anything in particular happened on June 30, 2004, to make that particular date her disability onset date. Panosh answered "[n]o. I believe mostly my panic and anxiety disorder had been heightening for several months before that I had upcoming [surgery]."[1] The ALJ also asked Panosh whether she believed she could perform any of her past work. Panosh testified that she could not perform any of her past work because:

> I have, really, my short-term memory has been really bad. And even taking notes from family members, I'm not getting complete notes down, and I'm doubting what I, you know, I have to call and call. I can't remember things and I get confused really easily.

(Administrative Record at 53.) The ALJ also questioned Panosh regarding her functional capabilities:

> Q:    How long are you able to sit at one time now?

---

[1] Administrative Record at 42-43.

A:   Probably at the most an hour without getting up. I'm supposed to elevate my left foot and ice it as it swells. And I'm still working on getting that one completely fixed, because it was reconstructed in August 2007, and I have a surgery date on May 22 to take some screws out. And hopefully that will get that better so I can get my other foot done.

Q:   And how often do you have to elevate your left foot?

A:   Whenever it starts to swell or throb. And that would be two to three times a day. . . .

Q:   And how long are you able to stand at one time?

A:   Not long. I would say half hour, maybe.

Q:   How long are you able to walk at one time?

A:   Less than that, probably. Fifteen minutes, maybe.

Q:   What's the heaviest weight that you lift and/or carry now?

A:   I guess it would be my six year old, and he weights 47 pounds. And that's only from the couch to the bedroom. . . .

Q:   Do you have any problems with your arms now, as far as using hand controls or anything like that?

A:   I really haven't tried to use hand controls on anything. I know I'm not able to do the video games with my son, but I can use a telephone and, you know. . . .

Q:   Are you able to reach in front of you with your arms?

A:   Yes.

Q:   Are you able to reach behind you?

A:   Not very well, and it hurts.

Q:   Can you reach overhead?

A:   Yeah, I believe so. Yeah.

(Administrative Record at 53-55.)

Panosh's attorney also questioned Panosh. Panosh's attorney asked Panosh whether she had difficulty with concentration. Panosh responded that she had "a lot" of difficulty with concentration and focus. She attributed her difficulties to psychological problems, anxiety, and pain. Next, Panosh's attorney asked Panosh how her anxiety affects her on a day-to-day basis. Panosh explained that:

I have problems going to the store. I can't be in the store without somebody and unfortunately my son is the one that

comes with me, and he's also got panic and anxiety, and agoraphobia, so we both come out of the store, I hear people when I'm in the store, I feel like I hear them talking about me. And then when I'm supposed to hear somebody I don't hear them. I come out, I have to leave the store fast.

(Administrative Record at 60-61.)

## 2. *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Vanessa May with a hypothetical for an individual who is able to:

do light work . . . but has some additional limitations. The person should never climb ropes, ladders, or scaffolds; only occasionally climb ramps or stairs on the job; but can frequently balance, stoop, kneel, crouch, and crawl. The person is limited to reaching with the left arm overhead occasionally. No other limitations in reaching. The person's able to do only simple routine repetitive work, and the work would be essentially isolated with only occasional supervision needed.

(Administrative Record at 76-77.) The vocational expert testified that under such limitations, Panosh could not perform her past relevant work. The vocational expert further testified that Panosh could perform the following work: (1) photocopy machine operator (250 positions in Iowa and 32,000 positions in the nation), (2) document preparer (1,300 positions in Iowa and 120,000 positions in the nation), and (3) addresser (200 positions in Iowa and 18,000 positions in the nation). The ALJ provided the vocational expert with a second hypothetical for an individual who:

is limited to sedentary work. . . . The person should never climb ropes, ladders, or scaffolds on the job; only occasionally climb ramps or stairs; occasionally balance, stoop, kneel, crouch, or crawl. The person is limited with the left hand in overhead reaching to occasionally; this person is right-hand dominant, however. The person should be able to alternate between sitting and standing every 30 minutes, but would not have to leave the work station. They'd just need to be able to change position briefly. And the person is able to do only

7

>simple routine repetitive work. The work would be essentially
>isolated with only occasional supervision needed.

(Administrative Record at 78-79.) Again, the vocational expert testified that under such limitations, Panosh could not perform her past relevant work. The vocational expert further testified that Panosh could perform sedentary jobs such as document preparer and addresser.

Panosh's attorney also questioned the vocational expert. Panosh's attorney inquired whether an individual who needed to elevate her legs at least three times during a workday, worked at a slow pace for up to one-third of the workday, and needed take multiple breaks outside of normal work breaks, would be employable. The vocational expert testified that under such limitations, Panosh could not find full-time competitive work.

### C. Panosh's Medical History

In February 2006, Dr. R. Paul Penningroth, M.D., began treating Panosh for anxiety and panic attacks. In his initial meeting with Panosh, Dr. Penningroth reviewed her medical history. Dr. Penningroth noted that Panosh started taking medication for "panic spells" when she was 13 years old. Dr. Penningroth indicated that she has "some anxiety everyday and a mild panic attack about every two weeks."[2] Panosh described her panic attacks as being unable to breathe, feeling sick to her stomach, and having palpitation and sweats. During a severe panic attack, Panosh reported that she feels like she is dying of a heart attack. Upon examination, Dr. Penningroth diagnosed Panosh with anxiety disorder. Dr. Penningroth treated Panosh with medication. Dr. Penningroth continued to see Panosh about once per month for medication management. In May 2006, Dr. Penningroth saw Panosh twice. On her second visit, Dr. Penningroth noted that Panosh had a couple of major panic attacks in the past week. Dr. Penningroth opined that "I do not think [Panosh] can work[.]"[3] Two weeks later, Dr. Penningroth released Panosh

---

[2] Administrative Record at 327.

[3] Administrative Record at 323.

to "look for work." Dr. Penningroth continued to see Panosh about once per month through December 2006, and generally found that she was doing "well" or "okay."

In December 2006, Panosh fell and hurt her ankle and foot. X-rays showed lateral soft-tissue prominence without signs of acute fracture. In January 2007, an MRI of Panosh's right ankle showed bone contusions of the calcaneus and talus and ankle effusion. Dr. David B. Van Roekel, M.D., found the MRI suggestive of a high grade sprain.

On March 15, 2007, Panosh met with Dr. Warren N. Verdeck, M.D., for electrodiagnostic consultation on her feet. In reviewing Panosh's medical history regarding her feet, Dr. Verdeck noted:

> This is a 44-year-old woman who apparently has had hammer toes and high arch feet ever since she remembers. She had an electrodiagnositc study done at age 18 and she tells me that 'no clear abnormalities were found.'
>
> In the meantime, she has had more problems with her feet. She wants to have surgery done for her 'crippled feet.' She has a history of severe anxiety and panic attacks. Family history is negative for anybody who has peripheral nerve disease.

(Administrative Record at 331.) Upon examination, Dr. Verdeck found that Panosh had normal motor and sensory nerve conduction studies of nerves of her left arm and left leg, and normal needle electrode examination of her left leg. Dr. Verdeck found no evidence of polyneuropathy, Charcot-Mary-Tooth disease, or hereditary motor sensory polyneuropathy. Dr. Verdeck opined that "I comfortably conclude, that the patient's foot deformity is not due to peripheral nerve disease and that she definitely does not have hereditary motor sensory polyneuropathy."[4]

On May 2, 2007, Dr. Penningroth provided the Iowa Department of Human Services with a "Report on Incapacity" for Panosh. Dr. Penningroth diagnosed Panosh with panic disorder, agoraphobia, and generalized anxiety disorder. Dr. Penningroth

---

[4] Administrative Record at 331.

opined that Panosh was not able to return to her usual employment, and recommended that she apply for long-term disability benefits.

On May 30, 2007, at the request of the Social Security Administration, Dr. Robert J. Schultes, M.D., conducted a consultative examination for Panosh. Panosh reported to Dr. Schultes that she was capable of:

> lift[ing] 5 pounds for 8 hours per day. She can carry 5 pounds for 8 hours per day. She can stand for 2 to 2-1/2 hours per day. She can move for about 4 hours per day. She can walk for 2 hours per day. She can sit for 4 hours per day. She can stoop for ½ hour per day. She can climb for 10 minutes secondary to feet and knees hurting. She cannot do any kneeling or crawling secondary to knee and foot pain. She can handle objects for 2 hours per day because her wrists become painful and swollen. She can see, hear and speak for 8 hours per day. She can travel for 8 hours per day. She cannot work around dust secondary to allergies to dust. She cannot work around paint fumes, secondary to them causing migraine headaches. She cannot work in temperatures above 80 to 85 degrees because she becomes sweaty and then becomes anxious and panicky. She has no problems around other hazards. She is able to drive a car.

(Administrative Record at 392-93.) Upon examination, Dr. Schultes diagnosed Panosh with chronic bilateral knee pain, chronic bilateral foot and right ankle pain, migraine headaches, history of anxiety and panic attacks, bilateral pain and swelling of the wrists with a history of carpal tunnel syndrome, pain in the right shoulder with decreased range of motion, decreased range of motion in the wrists, and decreased strength and flexion bilaterally.

On June 4, 2007, Richard Kaspar reviewed Panosh's medical records and provided Disability Determination Services ("DDS") with a Psychiatric Review Technique assessment for Panosh. Kaspar diagnosed Panosh with panic disorder and anxiety disorder. Kaspar determined that Panosh had the following limitations: mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. Kaspar concluded that:

> [Panosh] is typically described as cooperative and friendly with no depression, suicidal ideation, not [*sic*] history of psychiatric confinement. Panic and anxiety is generally mild and is influenced according to progress notes by situational stressors e.g. 'car broke down', 'broke into her place.' [Panosh's] allegations are partially credible in that [she] has had longstanding difficulties with anxiety of a mild nature imposing only [m]ild functional limitations.

(Administrative Record at 404.)

On June 12, 2007, R. Hughes reviewed Panosh's medical records and provided DDS with a physical residual functional capacity ("RFC") assessment for Panosh. Hughes determined that Panosh could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for at total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Hughes determined that Panosh could occasionally climb, and frequently balance, stoop, kneel, crouch, and crawl. Hughes found no manipulative, visual, communicative, or environmental limitations.

On August 15, 2007, Panosh underwent left foot surgery to correct a deformity in her foot. Dr. John E. Femino, M.D., noted that Panosh had a history of "severe" bilateral foot pain with bilateral cavovarus foot deformities. Dr. Femino indicated that her pain was primarily related to tarsal tunnel syndrome and metatarsalgia. Because nonoperative means of treatment did not achieve satisfactory pain relief, Panosh elected to undergo surgery. At a follow-up appointment six months after her surgery, Panosh continued to have "some" soreness around her ankle. She was able to tolerate weightbearing on her left foot, but had pain by the end of the day. She reported only using ibuprofen for "occasional" painful days. Dr. Femino recommended continued physical therapy, and prescribed pain medication as treatment.

On October 9, 2007, Dr. C. David Smith, M.D., reviewed Panosh's medical records and provided DDS with a RFC assessment for Panosh. Dr. Smith determined that

Panosh could: (1) occasionally lift and/or carry 10 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for at least 2 hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Smith determined that Panosh could occasionally climb, balance, stoop, kneel, crouch, and crawl. Dr. Smith also found that Panosh was limited in her ability to reach in all directions. Dr. Smith found no visual, communicative, or environmental limitations.

In August 2008, Dr. Penningroth filled out another "Report on Incapacity" for the Iowa Department of Human Services. In the report, Dr. Penningroth again diagnosed Panosh with anxiety, panic disorder, and agoraphobia. Dr. Penningroth opined that Panosh's condition was permanent. Dr. Penningroth indicated that Panosh needed regular psychological medication checks for anxiety and panic attacks. Dr. Penningroth indicated that it was appropriate for Panosh to apply for long-term disability benefits.

In April 2009, Dr. Penningroth filled out a "Mental Impairment Questionnaire" for Panosh's attorney. Dr. Penningroth diagnosed Panosh with anxiety disorder, agoraphobia, and personality disorder. Dr. Penningroth indicated that he treated Panosh with medication and psychotherapy. Dr. Penningroth noted that Panosh had restriction of behavior due to anxiety. Dr. Penningroth found Panosh's prognosis to be "guarded." Dr. Penningroth described Panosh's signs and symptoms as follows: generalized persistent anxiety, mood disturbance, difficulty thinking and concentrating, apprehensive expectation, persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation, intense and unstable interpersonal relationships and impulsive damaging behavior, motor tension, easy distractibility, sleep disturbance, and recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once per week. Dr. Penningroth determined that Panosh was seriously limited, but not precluded from: working in coordination with or proximity to others without being unduly distracted, completing a normal workday and

workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, responding appropriately to changes in a routine work setting, dealing with normal work stress, carrying out detailed instructions, interacting appropriately with the general public, maintaining socially appropriate behavior, adhering to basic standards of neatness and cleanliness, traveling in an unfamiliar place, and using public transportation. Dr. Penningroth found that Panosh had the following limitations: moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Dr. Penningroth concluded that Panosh would miss more than four days of work per month due to her impairments and treatment of her impairments.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Panosh is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007); *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is

determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In order to establish a disability claim, "the claimant bears the initial burden to show that [he or] she is unable to perform [his or] her past relevant work." *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity ("RFC") to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Id*. The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. §§ 404.1545, 416.945. "It is 'the ALJ's responsibility to determine [a] claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and [the] claimant's own description of her limitations.'" *Page*, 484 F.3d at 1043 (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Panosh had not engaged in substantial gainful activity since June 30, 2004. At the second step, the ALJ concluded from the medical evidence that Panosh had the following severe impairments: osteoarthritis of the knees, anxiety, status post right rotator cuff repair, degenerative disc disease of the cervical spine and lumbar spine, right foot deformity, and status post reconstructive left foot surgery. At the third step, the ALJ found that Panosh did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Panosh's RFC as follows:

> [F]rom the alleged date of onset of June 30, 2004, until her fall on December 16, 2006, [Panosh] had the residual functional capacity to do light work . . . except that [she] could not climb ropes, ladders, and scaffolds; could only occasionally climb ramps or stairs; and could frequently balance, stoop, kneel, crouch, or crawl. [Panosh] could only occasionally reach overhead with her left arm; she is right-

hand dominant. Finally, [she] was limited to simple, routine, repetitive work; the work would have been essentially isolated, with only occasional supervision needed. As of her fall on December 16, 2006, and continuing, [Panosh] has the residual functional capacity to perform sedentary work . . . except she can never climb ropes, ladders, and scaffolds; can only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps/stairs. She can only occasionally reach overhead with her left arm; she is right-hand dominant. Further, [she] is limited to simple, routine, repetitive work; the work must be essentially isolated, with only occasional supervision needed. In addition, [Panosh] must be able to alternate between stand and sit every 30 minutes.

(Administrative Record at 14.) Also at the fourth step, the ALJ determined that Panosh could not perform any of her past relevant work. At the fifth step, the ALJ determined that based on her age, education, previous work experience, and RFC, Panosh could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Panosh was not disabled.

### B. Objections Raised By Claimant

Panosh argues that the ALJ erred in three respects. First, Panosh argues that the ALJ failed to properly consider the opinions of her treating physician, Dr. Penningroth. Next, Panosh argues that the report of the consultative examiner, Dr. Schultes, was incomplete. Finally, Panosh maintains that the ALJ's RFC assessment is not supported by substantial evidence due to the ALJ's failure to properly consider the opinions of Dr. Penningroth, and the incomplete consultative examination contained in the record.

### 1. Dr. Penningroth's Opinions

Panosh argues that the ALJ failed to properly evaluate the opinions of her treating physician, Dr. Penningroth. Specifically, Panosh argues that the ALJ failed to give good reasons for discounting Dr. Penningroth's opinions. Panosh concludes that this case should be remanded for further consideration of Dr. Penningroth's opinions.

An ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v.*

*Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). The opinion of a treating physician:

> should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted).

"Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.' *Id.*"); *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

The regulations also require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *Id.*; *see also Tilley v. Astrue*, 580 F.3d 675, 680 (8th Cir. 2009) ("The regulations require the ALJ to 'always give good reasons' for the weight afforded to the treating source's opinion.") (citation omitted).

In her decision, the ALJ addressed the opinions of Dr. Penningroth:

As for opinion evidence, treating physician Dr. Penningroth completed 'disability verification,' a mental impairment questionnaire, and a report of incapacity[.] . . . In each, Dr. Penningroth's answers opined [Panosh] to be unable to sustain gainful employment. In contrast, the undersigned notes the doctors' [*sic*] contemporaneous treatment notes provided no such limitation or restriction on [Panosh's] ability to engage in substantial gainful activity. The undersigned notes such conclusion is also not supported by the objective medical evidence as whole. . . . On the other hand, statements that a claimant is 'disabled', 'unable to work', can or cannot perform a past job, meets a Listing or the like, are not medical opinions, but are administrative findings dispositive of a case, requiring familiarity with the Regulations and legal standards set forth therein. Such issues are reserved to the Commissioner, who cannot abdicate his statutory responsibility to determine the ultimate issue of disability. Opinions on issues reserved to the Commissioner, such as those of Dr. Penningroth reported above, can never be entitled to controlling weight, but must be carefully considered to determine the extent to which they are supported by the record as a whole or contradicted by persuasive evidence. Further, the possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patients requires and avoid unnecessary doctor/patient tension. While it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case. As such, the undersigned affords great weight to the treatment notes of Dr. Penningroth, but only some weight to his opinions in the 'disability verification,' mental impairment questionnaire, and report of incapacity. The undersigned notes that some of Dr. Penningroth's opinions were offered for another agency, i.e., for another purpose. The undersigned further notes that quite restrictive mental limitations are incorporated into the residual functional capacity above.

(Administrative Record at 18-19.) Additionally, the ALJ found that:

> At one point or another in the record, in medical reports or records or in [Panosh's] testimony[], [Panosh] has reported the daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations with allegations of disability. While [Panosh] has given somewhat inconsistent answers in her functional reports, generally [she] is capable of performing personal care, preparing meals for herself and her family, and completing house and yard work duties. [Panosh] can get around town without assistance, shop for necessities and handle financial matters, as such needs arise. She can read and understand a newspaper; add, subtract, and make change; she can pay bills. She maintains a household for her three children, now ages 6, 10, and 22[.] . . . Overall, [Panosh's] reports of limited daily activities are inconsistent with her admitted daily activities. . . .

> [Panosh] has been prescribed and has taken appropriate medications for the alleged impairments, which weighs in [her] favor, but [she] acknowledges, and the medical records confirm, that the medications have been relatively effective in controlling [her] symptoms and have no side effects. A review of [Panosh's] work history shows that [she] worked only sporadically prior to the alleged disability onset date, which raises a question as to whether [her] continuing unemployment is actually due to medical impairments.

(Administrative Record at 17-18.)

Having reviewed the entire record, the Court finds that the ALJ properly considered and weighed the opinion evidence provided by Dr. Penningroth. The Court also finds that the ALJ provided "good reasons" both explicitly and implicitly for rejecting Dr. Penningroth's opinions. *See* 20 C.F.R. § 404.1527(d)(2); *Strongson*, 361 F.3d at 1070; *Edwards*, 314 F.3d at 967. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

## 2. *Consultative Examination and RFC Determination*

Panosh argues that the opinions of the consultative examiner, Dr. Schultes, are incomplete. Panosh maintains that this matter should be remanded to require the ALJ to order a new consultative examination. Panosh also argues that the ALJ's RFC assessment is not supported by substantial evidence in the record. Again, Panosh asserts that this matter should be remanded so that the ALJ can more fully and fairly develop the record with regard to her RFC.

An ALJ has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

An ALJ also has the responsibility of assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)). However, "RFC is a medical question, and an ALJ's finding must be supported by some medical evidence." *Guilliams*, 393 F.3d at 803 (citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

Additionally, an ALJ may order medical examinations and tests when the medical records presented to him or her constitute insufficient medical evidence to determine whether the claimant is disabled. *Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994) (citation omitted); *see also* 20 C.F.R. § 404.1519a(a)(1) ("The decision to purchase a consultative examination . . . will be made after we have given full consideration to whether the additional information needed is readily available from the records of your medical sources."). 20 C.F.R. § 404.1519a(b) provides that "[a] consultative examination may be purchased when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on . . . [the] claim." *Id.* For example, a consultative examination should be purchased when "[t]he additional evidence needed is not contained in the records of your medical sources." 20 C.F.R. § 404.1519a(b)(1).

Here, the ALJ thoroughly reviewed Panosh's medical records and fully considered the opinions of treating and consultative sources.[5] The Court finds such medical evidence adequate for making a disability determination. No crucial issues were undeveloped and the medical evidence was based on medically acceptable clinical and laboratory diagnostic techniques. While Dr. Schultes opinions may not be an example of a superior consultative examination, the Court finds that Dr. Schultes' examination, along with the extensive medical records and opinions of treating sources and other consultative sources is fully adequate for making a disability determination. Accordingly, the Court determines that remand is unnecessary for a new consultative examination. *See Barrett*, 38 F.3d at 1023 (an ALJ may order a medical examination when the medical records presented to him or her constitute insufficient medical evidence to determine whether the claimant is disabled). Accordingly, the Court determines that the ALJ fully and fairly developed the record as to the medical evidence in this case. *See Cox*, 495 F.3d at 618.

Similarly, with regard to the ALJ's RFC assessment for Panosh, the Court, having reviewed the entire record, finds that the ALJ properly considered Panosh's medical records, observations of treating and consultative physicians, and Panosh's own description

---

[5] *See* Administrative Record at 15-20.

of her limitations in making her RFC assessment for Panosh. *See Lacroix*, 465 F.3d at 887. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

## *VI.  CONCLUSION*

The Court finds that the ALJ properly considered and weighed the opinion evidence provided by Panosh's treating doctor, Dr. Penningroth. The Court also finds that the ALJ fully and fairly developed the record with regard to the medical evidence in the case, and made a proper RFC assessment for Panosh. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## *VII.  ORDER*

For the foregoing reasons, it is hereby **ORDERED**:

1.      The final decision of the Commissioner of Social Security is **AFFIRMED**;

2.      Plaintiff's Complaint (docket number 3) is **DISMISSED** with prejudice; and

3.      The Clerk of Court is directed to enter judgment accordingly.

DATED this _14th_ day of March, 2012.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA